## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **MARY JOLENE CURRY,** | |
| **Plaintiff,** | **CASE NO.  4:13CV3074** |
| **vs.** | |
| **CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration;** | **MEMORANDUM AND ORDER** |
| **Defendant.** | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance benefits ("DIB") and widow's benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*

## PROCEDURAL HISTORY

Plaintiff Mary Jolene Curry ("Plaintiff") filed her applications for disability benefits and widow's benefits under Title II on July 9, 2010. (Tr. 198-204.) Plaintiff's claims were denied initially on November 16, 2012 (Tr. 11, 64-65, 80-87), and on reconsideration on February 25, 2011 (Tr. 11, 67-68, 92-109.) A hearing was held before an Administrative Law Judge ("ALJ") on February 8, 2012. (Tr. 32.) On February 23, 2012, the ALJ found that Plaintiff was not under a "disability" as defined in the Act (Tr. 11-25.)

The ALJ found that Plaintiff had the following severe impairments: obesity; fibromyalgia; and history of fracture and internal fixation of the left ankle. (Tr. 14.) The ALJ also found that although Plaintiff's depression was a medically determinable impairment, it did not cause more than mild limitations and was therefore not a severe impairment. (Tr. 14-17.) The ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one contained in, 20 C.F.R.

part 404, subpart P, appendix 1. (Tr. 17.) The ALJ determined that Plaintiff retained the RFC to perform unskilled,[1] routine and repetitive light work as defined in 20 C.F.R. § 404.1567(b), with additional limitations. (Tr. 17.) The ALJ concluded that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently and stand, sit, or walk for 6 hours during an 8-hour workday. (Tr. 17.) Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 17.) The ALJ noted that Plaintiff was to avoid concentrated exposure to extreme cold, humidity, and vibration. (Tr. 17.) The ALJ found that Plaintiff's impairments would not preclude her from performing work that existed in significant numbers in the national economy, including work as a garment sorter, routing clerk, and cafeteria attendant. (Tr. 24.) Consequently, the ALJ found that Plaintiff was not disabled. (Tr. 25.)

On February 8, 2013, after reviewing additional evidence, the Appeals Council denied Plaintiff's request for review. (Tr. 1-4.) Thus, the ALJ's decision stands as the final decision of the Commissioner. Plaintiff asks the Court to review the decision of the ALJ and the new evidence submitted to the Appeals Council, and reverse and set aside the decision of the Commissioner denying Claimant a period of disability, remanding the matter to the ALJ for a determination of appropriate benefits under 42 U.S.C. § 405(g).

---

[1] The ALJ defined "unskilled" with respect to Plaintiff to mean specific vocational preparation ("SVP") 1 or 2. Social Security Ruling (SSR) 00-4p explains, "The Dictionary of Occupational Titles ('DOT') lists a specific vocational preparation ('SVP') time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."

## FACTUAL BACKGROUND

In her application for benefits, Plaintiff stated that she was born in 1957, and alleged that she became disabled beginning June 1, 2006. (Tr. 198.) In her Disability Report, Plaintiff alleged disability due to "fibromyalgia, left ankle, left wrist problems" (Tr. 240.)

### I.    Documentary Evidence Submitted to the ALJ

Plaintiff was diagnosed with fibromyalgia by a rheumatologist in 2002. (Tr. 403, 466.) Thereafter, she received care for her chronic conditions of major depressive disorder and fibromyalgia from general practitioner David Rutz, M.D., and physician's assistant Ann Moore, P.A. (Tr. 323-48, 444-504.) In May 2006, Plaintiff informed P.A. Moore that she had separated from her job and needed a letter for employment benefits. (Tr. 328.) P.A. Moore recommended that Plaintiff stay on Wellbutrin due to her memory and concentration issues. (Tr. 328.) Medication refills were called in during May, August, and September 2006. (Tr. 328.) P.A. Moore again evaluated Plaintiff in October 2006, after complaints of a cough. (Tr. 328.)

In March 2007, Plaintiff reported that she was frustrated with attempts to exercise that seemed to exacerbate her fibromyalgia. (Tr. 327.) P.A. Moore discussed diet and exercise and gave Plaintiff a suggested list of reading materials to learn more about diet changes to help her lose weight and reduce her fibromyalgia symptoms. (Tr. 327.) Plaintiff agreed to follow up if she had any further questions. (Tr. 327.) Medication refills were called in during March, June, August, and September 2007. (Tr. 327.)

Plaintiff's next office visit was in February 2008, when she was treated for pneumonia. (Tr. 326-27.) In March 2008, Plaintiff called P.A. Moore and reported that

3

she pulled a muscle in her shoulder two weeks earlier. (Tr. 326.) P.A. Moore called in a pain reliever to the pharmacy and told Plaintiff to follow-up if the muscle did not improve. (Tr. 326.) Medication refills were called in during April 2008. (Tr. 326.)

In June 2008, Plaintiff was somewhat tearful as she complained to P.A. Moore that she was noticing memory problems despite taking Wellbutrin and Lexapro. (Tr. 326.) She stated she could not multi-task anymore and had trouble navigating from point A to point B. (Tr. 326.) She told P.A. Moore that she had tried to go back to work, but her difficulty multi-tasking and the memory problems were creating quite a bit of stress and insomnia. (Tr. 326.) She also continued to struggle with fibromyalgia pain and sometimes her feet hurt so much for months at a time that she could not stand for prolonged periods. (Tr. 326.) She asked P.A. Moore about Lyrica. (Tr. 326.) P.A. Moore examined Plaintiff for attention deficit hyperactivity disorder ("ADHD"), fibromyalgia, and allergic rhinitis. (Tr. 326.) She discussed possible psychological testing and prescribed methylphenidate with no refills. (Tr. 326.) She also recommended that Plaintiff take a magnesium supplement. (Tr. 326.) She told Plaintiff that due to cost and side effects, Lyrica might not be appropriate for her at that time. (Tr. 326.) In response to Plaintiff's complaints of insomnia, P.A. Moore recommended a sleep routine and changed a medication that Plaintiff was taking at bedtime that may have contributed to her insomnia. (Tr. 326.) She told Plaintiff to follow up in two weeks. (Tr. 326.)

Medication refills were called in during July, August, September, and October 2008 and January and February 2009. (Tr. 325-26.) Plaintiff was not seen again in the office until March 2009, when she complained to P.A. Moore of eight months of right-sided chest tightness that woke her up at night, and worsening heartburn. (Tr. 325.) She

4

had been vomiting in the middle of the night for more than one month. (Tr. 325.) P.A. Moore noted that Plaintiff's cardiac work-up in 2005 was normal. (Tr. 325.) Her physical examination was normal. (Tr. 325.) At her annual physical the next week, Plaintiff complained to P.A. Moore that she was frustrated in her attempts to exercise regularly and lose weight. (Tr. 325.) Walking often worsened her fibromyalgia. (Tr. 325.) Her physical examination was normal. (Tr. 325.)

In April 2009, Plaintiff fractured her left ankle when she stepped awkwardly off of a curb. (Tr. 316-17.) Justin Harris, M.D., an orthopedic surgeon, performed an open reduction and fixation surgery the next week. (Tr. 314-15.) Post-operative x-rays indicated the surgery was successful. (Tr. 311-12.) Plaintiff could bear weight on the left ankle by May 2009, six weeks after her surgery. (Tr. 312.) In July 2009, Dr. Harris noted that Plaintiff was doing well. (Tr. 311.) She still had "some swelling," which Dr. Harris stated was to be expected and would continue to improve with time. (Tr. 311.) He released her to full activity, as tolerated. (Tr. 311.)

In June 2010, P.A. Moore noted that Plaintiff had ongoing fibromyalgia pain and depression. (Tr. 324.) Plaintiff told P.A. Moore that she quit her job in 2006 because of difficulty concentrating and memory problems. (Tr. 324.) She reported that she continued to have problems sleeping at night, mostly because of fibromyalgia pain and arthritis pain in her hands. (Tr. 324.) P.A. Moore assessed insomnia, fibromyalgia, osteoarthritis, and major depressive disorder. (Tr. 324.) She noted that these conditions were managed with medication. (Tr. 324.) She told Plaintiff that menopause might be contributing to her insomnia. (Tr. 324.) P.A. Moore strongly recommended that Plaintiff

get trained for a job that would allow her to stay home, such as medical transcriptionist. (Tr. 324.)

Plaintiff called P.A. Moore in July 2010 and reported some swelling in her left ankle. (Tr. 323.) P.A. Moore told her to follow up with Dr. Harris if her ankle continued to swell and called in a water pill to the pharmacy. (Tr. 323.) A medication refill was called in during September 2010. (Tr. 444.)

In October 2010, Barb Eckert, Psy.D., performed a psychological consultative examination of Plaintiff in connection with her disability application. (Tr. 350-54.) Dr. Eckert observed depressed mood and some psychomotor retardation. (Tr. 351.) Plaintiff showed no deficits in memory or cognition and maintained concentration and attention during the visit. (Tr. 351-52, 353.) Plaintiff told Dr. Eckert that she occasionally looked through the paper for jobs but had difficulty finding a job that she could do. (Tr. 350.) She stated she could get along with co-workers and supervisors. (Tr. 350.) Plaintiff had difficulty completing household chores because of pain and would complete them in stages. (Tr. 351.) Her daughter also helped with the chores. (Tr. 351.) Dr. Eckert diagnosed Plaintiff with major depressive disorder, recurrent, mild, and asserted that she appeared to be "limited in some areas however Plaintiff does not appear disabled at the current time in respect to her Axis I diagnosis." (Tr. 352, 353-54.) She stated that Plaintiff's mental status suggested some mild difficulty with concentration and attention, but appeared in the normal range. (Tr. 353.) Dr. Eckert stated that it appeared Plaintiff was able to manage fairly consistently in her day-to-day life and recommended that she continue to utilize medication management and counseling. (Tr. 353.)

6

Also in October 2010, Brendon Connealy, M.D., performed a physical consultative examination of Plaintiff. (Tr. 402-12.) Dr. Connealy noted that Plaintiff walked with a left-sided limp. (Tr. 409.) Upon physical examination, Plaintiff had mild edema in her lower extremities, positive straight-leg raising and some limitations in her range of motion about her hips, knees, shoulders, wrists and lumbar spine. (Tr. 408-09.) Dr. Connealy noted that Plaintiff's obesity contributed to these deficits. (Tr. 408, 410.) Plaintiff had minimally decreased dorsiflexion in her left wrist but retained normal grip strength and showed negative Tinel's and Phalen's tests. (Tr. 408, 411.) Plaintiff had no joint tenderness, aside from very minimal tenderness in her back and hips, and full strength in her upper and lower extremities. (Tr. 409, 411.) Dr. Connealy stated that due to Plaintiff's limitations, she would need to avoid prolonged standing, significant physical activity or upright positioning, secondary to her ankle pain. (Tr. 410.) X-rays of her left wrist and ankle taken that day showed no acute osseus abnormality. (Tr. 493.)

Plaintiff presented to Dr. Rutz in February 2011 to have him complete forms for her attorney. (Tr. 415.) In the forms, Dr. Rutz stated Plaintiff continued to complain of unrelenting depression. (Tr. 415.) Dr. Rutz assessed fibromyalgia and major depressive disorder and changed Plaintiff's depression medications. (Tr. 415.) In completing the forms, Dr. Rutz opined that Plaintiff was not capable of any substantial gainful employment. (Tr. 394.) He stated that she was limited from chronic total body pain as well as depression that was unremitting and associated with poor focus, chronic fatigue, and lack of ambition. (Tr. 394.) He indicated she also had trouble with obtaining restorative sleep. (Tr. 394.) He stated that some days were better than others, but that her symptoms were unpredictable. (Tr. 394.) He opined that she became disabled in

7

2006 due to major depression, fibromyalgia, and chronic fatigue. (Tr. 394.) He assessed that during a day, Plaintiff could stand 30 minutes before needing to rest (sit with legs elevated). (Tr. 394.) She could walk 15 to 20 minutes before needing to rest and could sit for 40 minutes before needing to stand to reduce stiffness. (Tr. 394.) She could bend for 15 minutes, stoop for 1 to 2 minutes, and lift and carry 10 to 15 pounds for 10 minutes before needing to rest. (Tr. 394.)

Medication refills were called in during December 2011. (Tr. 504.) Plaintiff told Dr. Rutz in April 2012 that her disability claim had been turned down and she felt even more depressed. (Tr. 504.) She also had injured her left shoulder and her range of motion was markedly reduced. (Tr. 504.) Dr. Rutz wrote that Plaintiff had all the symptoms and the tender points necessary for a diagnosis of fibromyalgia. (Tr. 504.) He prescribed Cymbalta for Plaintiff's depression. (Tr. 504.) She returned two weeks later and asked about an alternative to Cymbalta because of the cost. (Tr. 504.) She also requested a steroid injection for her left shoulder. (Tr. 504.) Medication refills were called in during June and July 2012. (Tr. 503.) On April 25, 2012, Dr. Rutz noted that so far Plaintiff had had no significant improvement in pain, and that she was concerned about the cost of Cymbalta and asked about Effexir. (Tr. 504.) However, she was told Effexir was not approved for fibromyalgia. (Tr. 504.)

Plaintiff complained to P.A. Moore of an ear infection in July 2012. (Tr. 502-03.) Plaintiff reported that she experienced lightheadedness and dizziness in the two weeks prior to her visit. (Tr. 503.) The next month, she stated that Cymbalta was helping a little. (Tr. 502.) It was also noted that Plaintiff had tried Abilify a year before the visit, but had to discontinue use because of cost.  (Tr. 503.)

8

In September 2012, she told P.A. Moore that she continued to be frustrated that she was denied disability benefits. (Tr. 502.) The notes indicate that trazadone was not working for Plaintiff's insomnia, and that sometimes she did not fall asleep until 3:00 a.m. (Tr. 502.) Plaintiff stated that many days her fibromyalgia was so bad that she found it difficult to walk into a store from the parking lot. (Tr. 502.) She also reported that Cymbalta helped her depression, and P.A. Moore gave her free samples and a voucher for free pills. (Tr. 502.) At her appointment in November 2012, Plaintiff had lost 27 pounds and asked to change from Cymbalta to venlafaxine. (Tr. 501-02.)

## II.    Evidence Presented at the Hearing

At her administrative hearing on February 8, 2012, Plaintiff testified that she completed high school and then took cosmetology courses. (Tr. 40.) She had been married twice and had two children from her first marriage. (Tr. 40-41.) She lived in a house with her boyfriend. (Tr. 41.) She had a driver's license (Tr. 41), but would not drive when she took her medications because they made her foggy and she could not concentrate. (Tr. 46-47, 53-55.) She testified that she believed her medications controlled her disease "the best that it can be" and noted that she had tried several different treatments since she was diagnosed. (Tr. 50.) She estimated that four or five days per month she was not able to work at all due to fibromyalgia. (Tr. 50.) Even on other days, she had problems with concentration. (Tr. 50.)

Plaintiff testified that she stopped working in 2006 because of memory issues and because her pain level got worse. (Tr. 44-45, 46.) After leaving work, she received the full amount of unemployment benefits. (Tr. 46-47.) She did some job searching but was unable to predict when her fibromyalgia would prevent her from working. (Tr. 48.)

9

She testified that she could not sit for very long and had to be able to alternate between sitting and standing. (Tr. 50-51.) Even on her good days, she had difficulties with concentration and memory. (Tr. 50-51.) She did not do aerobics, but spent 20 minutes doing stretches each day. (Tr. 51-52.) She spent the rest of the day sitting, walking, and sleeping. (Tr. 52.) She liked to scrapbook and sew, when possible. (Tr. 52.)

Plaintiff's boyfriend, Frank Orr ("Orr"), gave a statement on August 2, 2010, in which he described his three-year relationship with Plaintiff. (Tr. 59.) He stated that he saw her daily. (Tr. 259.) He helped her prepare meals and shop because she could not stand for long periods of time. (Tr. 259.) He also stated that she could not walk long distances. (Tr. 259.) In a stressful situations, she would become tired. (Tr. 260.) He also reported that she had problems bending, stooping and climbing stairs. (Tr. 261.)

Plaintiff originally told the ALJ that she was not alleging any kind of a mental impairment. (Tr. 52.) She reiterated that she had problems with concentration and memory and confirmed that she had been diagnosed with depression. (Tr. 52-53.) She testified when she had tasks with several steps, she couldn't do the steps in the right order. (Tr. 53.) On November 21, 2005, she was forced to give up her job at the University of Nebraska, where she scheduled appointments for the person who promoted the school, because she would forget steps and could not properly complete the job. (Tr. 53.) There were days when she didn't go to work because she had not been able to sleep and couldn't function in the morning. (Tr. 54 .) On those days, her thought processes were foggy and she did not feel safe driving. (Tr. 54.) On such days she said it was "just like everything is all jumbled together." (Tr. 54.) She stated this happened "a lot" during the course of a month. (Tr. 55.)

Theresa Wolford, a vocational expert, testified in response to a hypothetical question posed by the ALJ, outlining Plaintiff's age, education, work experience, and work-related limitations. (Tr. 56-61.) The ALJ stated that the hypothetical individual was capable of performing light exertional work; could lift or carry 20 pounds occasionally and 10 pounds frequently and stand, sit, or walk for 6 hours during an 8-hour workday; could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 57.) The hypothetical individual was to avoid concentrated exposure to cold, humidity, and vibration, and was limited to unskilled, SVP 1-2, routine, repetitive jobs. (Tr. 57-58.) Considering the exertional and non-exertional limitations described by the ALJ, the vocational expert testified that the hypothetical person could perform a wide range of unskilled light jobs. (Tr. 58-59.) She provided the representative occupations of garment sorter, routing clerk, and cafeteria attendant. (Tr. 59.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue*, 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's

decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

In a DIB case, the burden is on the claimant to prove that he or she has a disability. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987).

The ALJ concluded that Plaintiff had not met her burden, and that she could engage in gainful employment. Plaintiff asserts several errors in the ALJ's decision, including assertions that the ALJ's findings: failed to give appropriate weight to the Platintiff's treating physician; failed to find that Plaintiff's testimony was not fully credible; failed to properly consider the testimony of Frank Orr; and failed to properly consider the effects of Plaintiff's depression on her residual functional capacity ("RFC"). Further, Plaintiff claims the ALJ erred in finding that Plaintiff was capable of work and in failing to

award Plaintiff widow's benefits under the Act. The Court concludes that substantial evidence in the record supports the ALJ's decision.

## I.    Weight Given to Opinion of Treating Physician

Plaintiff argues that the ALJ failed to give sufficient weight to the opinion of her treating physician, Dr. Rutz.  When analyzing a DIB claim, the ALJ must consider all relevant evidence, including medical records and medical opinions. *See* 20 C.F.R. §§ 404.1513, 404.1520, 404.1520b, 404.1527. "Generally, 'a treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting *Perkins v. Astrue,* 648 F.3d 892, 897 (8th Cir.2011)) (internal marks omitted); *see also* 20 C.F.R. § 404.1527(c)(2). If a treating provider's opinion is afforded controlling weight, the ALJ is required to defer to the physician's medical opinions with respect to the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairments, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart,* 392 F.3d 988, 995 (8th Cir.2005). An opinion that an applicant is "disabled" or "unable to work" is an issue that is reserved for the Commissioner and is not a "medical opinion" that must be given controlling weight. *Ellis,* 392 F.3d at 994.

"[A] treating physician's opinion does not automatically control, since the record must be evaluated as a whole." *Renstrom*, 680 F.3d at 1064 (quoting *Perkins,* 648 F.3d at 897). "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical

evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Perkins,* 648 F.3d at 897–98 (internal quotation marks and citation omitted). The ALJ must "always give good reasons" to explain the weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(c)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007). The ALJ must apply certain factors to determine what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *See* 20 C.F.R. 404.1527(c)(2).

The record demonstrates that the ALJ properly considered the necessary factors in giving weight to Dr. Rutz's opinion, and that her conclusion was supported by substantial evidence in the record. In examining the length of the treatment relationship, the ALJ recognized that Dr. Rutz had treated Plaintiff as early as 2002, but noted that when Dr. Rutz offered this opinion, he had not treated Plaintiff for over four years. (Tr. 21.)  Further, the ALJ noted that during the period Plaintiff visited Dr. Rutz's office most frequently, she was most often seen by a physician's assistant, rather than by Dr. Rutz. (Tr. 21.)

The ALJ also properly considered the inconsistencies between Dr. Rutz's opinion and the record as a whole. "[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the opinion."  *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). The ALJ concluded that Dr. Rutz's assessment was inconsistent with the other medical evidence. (Tr. 21.) The record of Dr. Rutz's previous treatment

14

notes did not reveal any difficulty with Plaintiff's gait or posture, nor did they indicate any trigger points to Plaintiff's pain, nor recommend any limitation on her activity. For this reason, the ALJ concluded that the significant limitations Dr. Rutz placed on Plaintiff were inconsistent with the record of his previous treatment of Plaintiff. (Tr. 21.)

Other evidence in the record is also inconsistent with Dr. Rutz's opinion. The ALJ noted that during an examination in October 2010, Dr. Connealy specifically noted that Plaintiff walked with a limp, but that this condition was not in her records from previous treatment providers. (Tr. 20, 409.) Dr. Connealy's evaluation did not reveal any significant limitations, and Dr. Connealy gave the opinion that Plaintiff would be limited to activities that did not require prolonged standing, significant physical activity or, upright positioning, secondary to her ankle pain, not her fibromyalgia. (Tr. 20, 410-11.) The record also demonstrates that other consultative examinations demonstrated that Plaintiff was capable of some work activity. (Tr. 385-92, 401.) The ALJ properly considered the inconsistencies between the severe restrictions Dr. Rutz placed on Plaintiff's activities and the opinions of other sources that recommended lesser restrictions. Properly considering the record as a whole, the ALJ determined that the inconsistencies warranted giving less than controlling weight to Dr. Rutz's opinions.

### Credibility of Plaintiff's Testimony

Plaintiff argues that the ALJ failed to explain why he found Plaintiff's testimony not credible. The ALJ has a duty to examine a claimant's subjective complaints of pain, even if the objective medical evidence does not support such complaints. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). When considering subjective complaints of pain, in addition to the objective medical evidence, the ALJ must consider

15

the claimant's daily activities; the duration, frequency and intensity of the pain; dosages, effectiveness and side effects of medication; and functional restrictions. *Id.* The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant. *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000). When evaluating symptoms, the SSA considers "medical opinions of . . . treating sources and other medical opinions." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

Plaintiff argues that the ALJ failed to address some of the *Polaski* factors and did not detail her reasons for her findings with respect to the others. "When making a determination based on these factors to reject an individual's complaints, the ALJ must make an express credibility finding and give his reasons for discrediting the testimony." *Shelton v. Chater,* 87 F.3d 992, 995 (8th Cir. 1996) (citing *Hall v. Chater*, 62 F.3d 220, 223 (8th Cir.1995)).  The Court first notes that there is no requirement that an ALJ cite the *Polaski* decision or discuss every *Polaski* factor.  It is sufficient if *Polaski* factors are referenced and considered and that an ALJ's credibility findings are adequately explained and supported.  *Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008); *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000). Further, the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

The ALJ determined that the Plaintiff's subjective complaints of pain were not credible only to the extent they were inconsistent with the RFC assessment. (Tr. 18-23.) The ALJ acknowledged that the Plaintiff experienced discomfort, but expressly concluded that her allegations of limitations and pain levels that precluded all types of

16

work were inconsistent with medical opinions, the objective medical evidence, the absence of more aggressive treatment, and the evidence as a whole. (Tr. 18.) In evaluating the objective medical evidence, the ALJ noted that Plaintiff infrequently mentioned symptoms related to fibromyalgia, bodily pain, or ankle problems subsequent to recovery from her surgery in 2009. (Tr. 19.) The ALJ stated that although Plaintiff was seen regularly, she rarely complained of swelling or pain. (Tr. 19.) The record of Plaintiff's visits with Dr. Rutz and P.A. Moore demonstrates that neither observed Plaintiff to have significant difficulties upon examination. (Tr. 19-20, 323-48, 444-504.) For example, although Plaintiff's fibromyalgia was present in 2007, treatment notes did not indicate significant limitations. (Tr. 19-20, 323-24, 325, 326-27.)

The ALJ expressly recognized that Plaintiff's treatment was sparse, and that gaps existed in her treatment history. (Tr. 19-20.) Thus, although Plaintiff claims she experienced frequent debilitating pain, her treatment was inconsistent with such. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). The ALJ concluded that Plaintiff's failure to seek treatment for her conditions for nearly 18 months suggested that her estimations of her pain and limitations were exaggerated.   (Tr. 22.) The ALJ noted that none of the treatment notes indicated that Plaintiff's medication regimen was ineffective in controlling her conditions. (Tr. 22); *see also Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) ("An impairment which can be controlled by treatment or medication is not considered disabling.").

Plaintiff argues this conclusion was in made error because she should not be punished for failing to seek treatment due to a lack of financial resources. The Court recognizes that economic hardship may explain a claimant's failure to seek medical treatment where a claimant presents evidence of such hardship. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (citing *Clark v. Shalala,* 28 F.3d 828, 831 n. 4 (8th Cir. 1994)). Although the Plaintiff referenced factors that may have contributed to a financial hardship, she did not provide evidence that she was denied medical treatment, or that it was inaccessible to her for financial reasons. To the contrary, the record demonstrates that Plaintiff had medical insurance and continued to receive prescriptions. (Tr. 324-28, 503.) Plaintiff was also given free samples of prescribed medication. (Tr. 324-28, 502-04.) At one point, Plaintiff expressed concern about the cost of Cymbalta, and she received free samples and a voucher for free pills, and then was switched to a cheaper alternative. (Tr. 502.) Accordingly, there is substantial evidence to support the ALJ's conclusion that Plaintiff's financial hardship did not prevent her from receiving medical treatment.

Although considered as a separate issue on appeal, the ALJ's treatment of the statement of Frank Orr is also relevant to the ALJ's credibility determination. Plaintiff asserts that the ALJ failed to give any reason for finding Orr's statement only partially credible and not more convincing than the weight of other evidence. (Tr. 22.) Plaintiff contends that Orr's statement corroborated her own subjective complaints of pain, and the ALJ acknowledged this to be so.  However, the Eighth Circuit has held that an "ALJ, having properly discredited [the plaintiff's] complaints of pain, [was] equally empowered to reject the cumulative testimony of [others]," where such testimony "merely

18

corroborated [the plaintiff's] testimony regarding her activities." *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998). For the reasons the ALJ discredited Plaintiff's testimony, she was likewise empowered to discredit Orr's cumulative testimony.

The ALJ also noted that Orr's testimony was not indicative of Plaintiff having a debilitating impairment. (Tr. 22); *see also Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010) ("We have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.") (internal quotations omitted). Orr explained that Plaintiff experienced pain, and that her ability was limited as a result. (Tr. 259-60.) However, his testimony also demonstrated that Plaintiff was able to engage in several daily activities. Orr explained that both he and Plaintiff prepared meals. (Tr. 259.) He also noted that Plaintiff could do her own chores but that he helped her at the store because she could not stand for long periods of time. (Tr. 259.) Orr stated that Plaintiff had no difficulties interacting with others, and that her grooming was great. (Tr. 260.) He also opined that she could adjust to changes, concentrate, and maintain attention. (Tr. 260-61.) The inconsistencies between these statements and Plaintiff's subjective complaints support the ALJ's credibility determination.

In sum, despite Plaintiff's claimed inability to work, the ALJ properly analyzed the *Polaski* factors in concluding that Plaintiff's allegations regarding the "limiting effects of her symptoms were inconsistent with some of the medical evidence of record." *Halverson*, 600 F.3d at 933. While Plaintiff also presented evidence consistent with her claimed debilitating symptoms, the Court cannot conclude that the ALJ's credibility determination is unsupported by the record as a whole. *See id.* (citing *Juszczyk v.*

19

*Astrue*, 542 F.3d 626, 632 (8th Cir.2008) (deferring to the ALJ's credibility determination where the objective medical evidence did not support the claimant's testimony as to the depth and severity of his physical impairments). The ALJ provided good reasons for discounting Plaintiff's credibility, and those reasons are supported by substantial evidence in the record. Accordingly, the Court will adopt the ALJ's credibility determinations.

### III.    Plaintiff's RFC Assessment

Plaintiff argues that the ALJ failed to consider the effects of her depression when determining that Plaintiff's disability did not preclude gainful employment. The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past

20

work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); *see also Bowen,* 482 U.S. at 140–41 (explaining five-step process).

At step four and five, the Commissioner assesses the claimant's RFC. 20 C.F.R. § 404.1520(e). "RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." *Leckenby v. Astrue,* 487 F.3d 626, 631 n. 5 (8th Cir.2007). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010). "The RFC must (1) give 'appropriate consideration to all of [the claimant's] impairments,' and (2) be based on competent medical evidence establishing the 'physical and mental activity that the claimant can perform in a work setting.'" *Partee v, Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Ostronski v. Chater,* 94 F.3d 413, 418 (8th Cir.1996)). In determining RFC, an ALJ should consider "[m]edical records, physician observations, and the claimant's subjective statements about [her] capabilities." *Id.* (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004)). Plaintiff argues that the ALJ erred in evaluating the effect of her depression on the RFC, and in concluding that she could engage in gainful employment.

**a.     Effect of Depression on RFC**

Plaintiff argues that the ALJ failed to consider Plaintiff's depression when conducting the RFC assessment. An impairment is severe if it significantly limits a plaintiff's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521. The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521. With respect to psychological limitations, a claimant must demonstrate that the limitation affects her ability to engage in substantial gainful activity. *See Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011) (upholding a decision where the ALJ had substantial evidence supporting a conclusion that a claimant's depression and anxiety were "not severe"). Accordingly, the ALJ must evaluate a claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1). The ALJ must then determine the degree of functional limitation resulting from the impairment.   20 C.F.R. § 416.920a(b)(2). To evaluate functional limitation, the ALJ must rate the degree of functional limitation in four functional areas: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 416.920a(c). If the ALJ rates the degree of limitation in the first three functional areas – activities of daily living; social functioning; concentration, persistence, or pace – as "none" or "mild" and "none" in the fourth area, the Commissioner "will generally conclude that [the claimaint's] impairment(s) [are] not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 416.920a(d)(1).

22

The ALJ concluded that Plaintiff's depression was a medically determinable impairment, but that it did not cause more than a minimal limitation on Plaintiff's ability to perform mental work activities. (Tr. 14.) The ALJ noted that in her testimony, Plaintiff initially stated that her mental condition did not affect her ability to work (Tr. 14, 52), but recognized that Plaintiff later amended her position to include that she was subject to memory and concentration problems, and that she was easily overwhelmed. (Tr. 14, 52-53). Nevertheless, following the analytical framework established by the regulations, the ALJ concluded that Plaintiff's difficulties with daily activities were related to her physical condition. (Tr. 14, 351.) Plaintiff was able to care for her personal hygiene and grooming and could complete basic household duties, though it took her longer because of her physical state. (Tr. 14-15, 351.) Although Dr. Eckert noted social difficulties, evidence in the record demonstrates that she regularly interacts with friends and family on a social basis. (Tr. 15, 254, 259-60.) Plaintiff also told Dr. Eckert that she had no difficulties getting along with co-workers and supervisors. (Tr. 350.) The ALJ recognized that although Plaintiff alleged she could not multi-task, she did not claim that she was mentally unable to complete at least simple or basic tasks and was able to read, complete simple instructions, and use basic memory and recall. (Tr. 15.)

Regarding the medical evidence, both Dr. Rutz and P.A. Moore diagnosed Plaintiff with depression and prescribed medication. (Tr. 324, 328-33, 445, 449-54, 459-462.) However, as stated above, such a diagnosis and a prescription of antidepressant drugs is not alone determinative of whether Plaintiff has a severe mental impairment. *See Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989). Dr. Eckert opined that Plaintiff's mental status suggested some mild difficulty with concentration and attention,

23

but appeared in the normal range. (Tr. 16, 353.) Dr. Eckert stated that it appeared Plaintiff was able to manage fairly consistently in her day-to-day life. (Tr. 16, 353.) State agency medical consultants found at the initial level and on reconsideration that Plaintiff had only mild limitations and that her depression was not severe. (Tr. 370, 373, 380, 382, 399.) Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's depression caused no more than "mild" limitations in her ability to perform basic work activities, and that her impairment was not severe.

### b.   Plaintiff's Ability to Perform Other Work

Plaintiff argues that at step five, the ALJ erred in concluding that Plaintiff could perform "other work" that existed in significant numbers in the national economy. If the RFC assessment at step four will not allow the claimant to perform past work, the burden shifts to the Commissioner to demonstrate that  the claimant's RFC will allow the claimant to make an adjustment to other work, and that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir.2004); 20 C.F.R. § 404.1520(a)(4)(v). The Commissioner may satisfy this burden through the testimony of a vocational expert. See 20 C.F.R. § 404.1566(e). Although this burden shifts to the Commissioner at step five, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir.2004).

The ALJ determined that Plaintiff's RFC demonstrated that she could perform unskilled (SVP 1 or 2), routine and repetitive light work as defined in 20 C.F.R. § 404.1567(b), but with additional limitations. (Tr. 17.) Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently and stand, sit, or walk for 6 hours during

24

an 8-hour workday. (Tr. 17.) She could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 17.) She was to avoid concentrated exposure to extreme cold, humidity, and vibration. (Tr. 17.)

Recognizing that Plaintiff could not perform past relevant work, the ALJ posed a hypothetical question to the vocational expert based on all of Plaintiff's limitations, which included a person of Plaintiff's age, education, and work experience. (Tr. 24, 57-58.) The vocational expert testified that the hypothetical person could perform work in the unskilled light labor market. (Tr. 58.) She provided representative examples of occupations including garment sorter, routing clerk, and cafeteria attendant. (Tr. 24, 59.) Relying on the vocational expert's testimony as applied to the evidence in the record, the ALJ concluded that there existed a significant number of jobs in the national economy that an individual with Plaintiff's impairments, symptoms, and limitations could perform. (Tr. 61.) For the reasons already discussed, the ALJ's conclusions with respect to the extent of her limitations are supported by substantial evidence in the record. Further, the ALJ properly relied on the testimony of the vocational expert in establishing the Commissioner's burden of showing a significant number of jobs in the national economy that an individual with Plaintiff's impairments, symptoms, and limitations could perform. Because the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence in the record, the ALJ also properly concluded that Plaintiff was not entitled to widow's benefits under 20 C.F.R. § 404.335(a).[2]

---

[2] The regulations require that a claimant seeking widow's benefits under 20 C.F.R. § 404.335(c) be disabled as defined in 20 C.F.R. § 404.1505. Because the Court affirms the ALJ's decision that Plaintiff is not disabled, it need not separately consider whether she is entitled to widow's benefits.

**CONCLUSION**

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed.  Accordingly,

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the Defendant will be entered in a separate

document.

Dated this 28th day of April, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge